KOEHLER, APPELLANT, *v.* KOEHLER, APPELLEE.

(No. 8743—Decided June 6, 1960.)

*Messrs. Brooks, Kelly & Eiselein* and *Mr. Smith H. Tyler, Jr.,* for appellant.
*Mr. Emil Vale,* for appellee.

LONG, J.   The life of Anton Koehler, the appellant, as portrayed by the record, is similar to that of many an immigrant who comes to this country in his earlier years and by dint of hard work succeeds in good measure in providing himself and his family with a happy life in the new country. His family consisted of his wife, a daughter, Alma, and his son, Walter, the appellee in this case. The father pursued the trade of baker; his wife had died and, as his children were married, he lived alone for some time. At the age of 65 he retired, having accumulated a couple pieces of real estate and some stocks, from the income of which he was able to support himself. As the

years advanced, the father contracted diabetes, and some time around 1955 he had a fall. He was taken to the hospital, and from that time on he was subjected to rather severe medical supervision. In early January 1956, the record discloses that the father was suffering from uncontrolled diabetes, cystitis, pylonephritis, uremic poisoning, and generalized and advanced arteriosclerosis. Dr. Owens testified that "he was a very sick man and his mental and physical capacities were very much impaired"; "his mind was not sound"; he "was not able to remember ordinary business transactions"; and "he probably did not know what he was doing and would not remember what he may have done." This was the medical report on Anton Koehler during his stay in the hospital.

It was at that time that Walter and his father concluded that dad might not get well and that the older gentleman should turn over his stocks to his son. The father gave his son the combination to his safe and Walter got his father to sign the stock certificates in blank. Walter's wife took the certificates to a broker who filled out the certificates, making Walter and his father owners in survivorship. Walter has maintained possession of the certificates.

It was not until the father attempted to cash the stock dividend checks that he says he discovered that he had to have Walter's signature. It was then that he demanded the return of the stock. He denied his signature; claimed that the signatures on the certificates were forgeries, because he did not remember signing the same. It must be kept in mind that the father's actions are directly in keeping with the conduct of a person physically and mentally affected, as described by Dr. Owens.

It is claimed by Walter that what his father did was to execute to him an irrevocable gift. In the first place, the father, to make any kind of a gift, *inter vivos* or *causa mortis*, must have had the capacity to make the gift. It is our opinion that the record discloses that the father had no such capacity at the time the certificates were signed. In the light of their relationship, a son of a sick father, and the son's testimony, we do not think it is sufficiently clear and convincing to sustain the gift theory. (*In re Estate of Fife*, 164 Ohio St., 449, paragraph six

of the syllabus; *Rosselott* v. *Rosselott*, 93 Ohio App., 425, 429, opinion by Judge Matthews.)

Can we believe that Anton Koehler, being the kind of father he was, would cut off his daughter, Alma? Why did Walter give his elderly father the proceeds from the sale of the Tidewater stock, if Walter was either the sole owner of the stock, half-owner, or owner in survivorship? The deal which the son claims he had with his father was never consummated. If Walter's contention is correct, why did he insist, when The Cincinnati Transit Company stock was sold, that it was "to have his name on it"? There is no dispute by Walter that his father was to get *all the dividends, not half.* Why were the stock certificates issued in the names of both father and son, if the claim of gift is sound logic? This, we think, is conclusive that the deal Walter claims he had with his father was never carried out to completion.

Now, are we able to follow the gift *causa mortis* theory? To constitute such a gift, there must be an intent to give, coupled with a complete surrender of all dominion and control over the property, effected by an absolute delivery, subject only to the condition that delivery to the donee not be made until the death of the donor. In this case, the father did not die. To use his own words: "I'm still here!" Furthermore, even if it was a gift *causa mortis*, the father revoked the gift before the happening of the event which would have vested title in Walter. The evidence is clear that the father revoked the so-called gift by demand, and, again, by the filing of the suit.

Counsel for appellee cites the case of *Central National Bank of Cleveland, Exr.,* v. *Society for Savings in City of Cleveland,* 109 Ohio App., 441, in support of his contention. It is the opinion of this court that that case is not applicable to the case at bar.

In 26 Ohio Jurisprudence (2d), 153, Section 11, we find this language: "There are, however, features which distinguish gifts *inter vivos* from gifts *causa mortis,* and the principles governing gifts of the former type are much simpler than those governing the latter. The distinguishing features are that a gift *causa mortis* is recoverable during the life of the donor, while a gift *inter vivos* is irrevocable; and a gift *causa mortis*

is conditional, while a gift *inter vivos* is not. A gift *inter vivos* divests the donor of all present control and dominion absolutely and irrevocably, which such control is upon a condition subsequent in the case of a gift *causas mortis*. The fact that the donor is in extremis, expects to die, and does die of a particular illness is not of controlling importance in determining whether a gift is *causa mortis* or *inter vivos*; the test is whether he intended the gift to take effect *in praesenti*, irrevocably, and unconditionally. Real property may be transferred by a gift *inter vivos* but not by a gift *causa mortis*.''

This court finds the equities to be in favor of the appellant. A decree in favor of the appellant will be entered in this court.

*Judgment for plaintiff.*

MATTHEWS, P. J., and O'CONNELL, J., concur.